FILED

UNITED STATES DISTRICT COURT   2015 JUN 16   AM 10: 15
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA

FEDERAL TRADE COMMISSION and
OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

       Plaintiffs,

v.

Case No.:   8 15-Cv- 1417-T-23 EAJ

E.M. SYSTEMS & SERVICES, LLC, a Florida
limited liability company; **ADMINISTRATIVE
MANAGEMENT & DESIGN, LLC**, a Florida
limited liability company; **KLS INDUSTRIES, LLC,
d/b/a SATISFIED SERVICE SOLUTIONS, LLC**,
a Florida limited liability company; **EMPIRICAL
DATA GROUP TECHNOLOGIES, LLC**, a Florida
limited liability company; **EPIPHANY MANAGEMENT
SYSTEMS, LLC**, a Florida limited liability company;
**STEVEN D. SHORT**, an individual; **KARISSA L.
DYAR**, an individual; **ONE EASY SOLUTION LLC**, a
Florida limited liability company; and **CHRISTOPHER
C. MILES**, an individual,

      Defendants.

_____/

## PLAINTIFFS' *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE, IMMEDIATE ACCESS, AND OTHER EQUITABLE RELIEF

### (FILED UNDER TEMPORARY SEAL)[1]

    This case is part of an ongoing law enforcement effort to combat a deluge of

telemarketing scams that take money from already indebted consumers through false promises of

debt relief. The Federal Trade Commission has filed several cases against such scams, including

a recent action against a near-identical scam in which two of the defendants here, Steven Short

---

[1] Motion to seal filed concurrently.



and Karissa Dyar, participated. *See FTC v. Pro Credit Group*, Case No. 8:12-cv-00586-T-35EAJ (M.D. Fla.).

Through a web of entities and fictitious business names, Defendants here operate a nationwide credit-card-interest-rate-reduction telemarketing scam (the "Debt Relief Scam"). The Debt Relief Scam works by cold calling consumers with false promises that Defendants will reduce consumers' interest rates on their credit cards, save them thousands of dollars in a short time period, and refund consumers' money if the promised savings are not realized. Defendants charge an advance fee of about $1,000 on average to consumers who fall prey to these false promises. In return for the hefty fees that they pay, most consumers do not achieve any debt relief at all, but instead find themselves saddled with even more debt than before because of the fees Defendants charge to their credit cards.

Given the nature of the fraudulent conduct of debt relief scams similar to the one here, Plaintiffs typically have requested, and district courts, including this Court in *Pro Credit*, have regularly entered, *ex parte* temporary restraining orders—which include asset freezes, immediate accesses, and receiverships over corporate defendants—to prevent the perpetrators of these scams from harming additional consumers, destroying evidence, and hiding fraudulently obtained assets in the period before a preliminary injunction is entered. The same preliminary relief is warranted in this case.

In support, Plaintiffs offer evidence that leaves little doubt that Defendants are presently engaged in the conduct alleged in the Complaint and described in this Motion and are thus violating Section 5(a) the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310; and Section 501.204 of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Chapter 501, Part II, Florida Statutes.

Plaintiffs' evidence also establishes that preliminary injunctive relief is necessary to prevent Defendants from hiding fraudulently obtained assets and destroying evidence. In light of this evidence, which is described in detail below, Plaintiffs respectfully request that the Court issue an *ex parte* temporary restraining order including an asset freeze, immediate access, appointment of a receiver, and an order to show cause why a preliminary injunction should not issue.

## STATEMENT OF FACTS

### A.    Plaintiffs Federal Trade Commission and the Florida Attorney General

Plaintiffs' investigation has produced evidence that confirms that Defendants are violating the FTC Act, TSR, and FDUTPA by making false and misleading representations to consumers, and are also violating the TSR by charging an advance fee for debt relief services. Plaintiffs' evidence in support of this Motion is collected in an Appendix of Evidence ("Appendix" or "App.") that, for ease of citation and reference, is consecutively paginated. The Appendix includes declarations, with attached exhibits, from:

- Twenty-six consumers who were targeted as part of Defendants' scam and who are representative of the larger number of consumers who have been targeted by Defendants (App. 0001-0688);

- Yasser Dandashly, the Florida Attorney General's principal investigator for this matter (App. 0689-1677);

- Evan Castillo, the FTC's principal investigator for this matter (App. 1678-1759); and

- Tawnia Yovanovich, a Trade Practice Specialist with the Better Business Bureau of West Florida, which received complaints about Defendants' conduct (App. 1760-1776).

3

## B.    The "E.M. Systems Defendants" and the "One Easy Defendants"

There are two interrelated sets of Defendants in this action: the "E.M. Systems Defendants" and the "One Easy Defendants." The E.M. Systems Defendants are the five entities and two individuals at the center of the scam, and the One Easy Defendants are the E.M. Systems Defendants' largest domestic telemarketer and its owner.[2]

### 1.    The E.M. Systems Defendants

The "E.M. Systems Defendants" consist of five business—E.M. Systems & Services, LLC, ("E.M. Systems"); Administrative Management & Design, LLC, ("AM&D"); KLS Industries, LLC, d/b/a Satisfied Services Solutions, LLC, ("KLS"); Empirical Data Group Technologies, LLC, ("EDG Tech"); and Epiphany Management Systems, LLC ("Epiphany") (collectively, the "E.M. LLC's")—and two individuals, Steven Short and Karissa Dyar, who are married to each other.[3] Each of the E.M. LLC's plays an integral role in the scam.

*E.M. Systems* is the funding source for the scam. Money from victimized consumers flows through numerous factoring agreements to E.M. Systems.[4] E.M. Systems uses the money from consumers to pay the fees of telemarketers like One Easy Solutions LLC.[5] E.M. Systems also distributes money to Defendants EDG Tech, KLS, Short, and Dyar.[6]

*KLS* prints and mails the documents and forms that the scam sends to consumers who agree to sign up for the purported services.[7] KLS also pays the registrant of the websites for the fictitious names used by the scam.[8] Between April 2013 and December 2014, KLS received more than $500,000 in wire transfers from E.M. Systems. Although KLS lists a mail drop as its

---

[2] Dandashly, App. 0719, ¶ 90.
[3] *Id.* at 0697, ¶ 27.
[4] *Id.* at 0719-22, ¶¶ 95-100. *See also id.* at 0707 (diagram of money flow).
[5] *Id.* at 0713, ¶ 60.
[6] *Id.* at 0712, ¶ 56; *id.* at 0715, ¶ 70; *id.* at 0716, ¶ 77.
[7] *Id.* at 0711, ¶¶ 52-54.
[8] *Id.* at 0712, ¶¶ 55-56.

4

principle place of business on its corporate registrations,[9] *KLS* rents a physical office space in Pinellas Park, Florida.[10]

*EDG Tech* identifies as its principal place of business on corporate documents an office space where the scam operates.[11]  Short and Dyar have been observed conducting businesses at this office space, and a recording/sales verification script bearing one of the scam's fictitious business names was recovered there.[12]  EDG Tech has transferred at least $20,000 to the manager of One Easy—the scam's largest domestic telemarketers.[13]  Between February and December 2014, all or nearly all deposits into EDG Tech's known bank accounts were from E.M. Systems.[14]

*AM&D* is used by the scam to establish mail drops for the various fictitious business names under which the scam operates.[15]  The addresses of these mail drops appear on the documents, forms, and websites used by the scam.[16]

*Epiphany* is a subscriber of the telephone providers used by the scam to conduct its telemarketing.[17]  Epiphany's principal place of business is listed on its corporate documents as Short and Dyar's home address.[18]

*Short* and *Dyar* know about, participate in, and control the scam.  Short is the owner and sole member manager of E.M. Systems, AM&D, EDG Tech, and Epiphany,[19] and the signatory

---

[9] Dandashly. App. 0710, ¶ 49.
[10] *Id.* at 0711, ¶ 54.
[11] *Id.* at 0714-5, ¶¶ 67-68.
[12] *Id.* at 0715, ¶¶ 68-69.
[13] *Id.* at 0715, ¶ 71; *id.* at 0719, ¶ 90.
[14] *Id.* at 0715, ¶ 70.
[15] *Id.* at 0709, ¶ 45.
[16] *Id.* at 0709, ¶ 45.
[17] *Id.* at 0700-3, ¶¶ 34-35.
[18] *Id.* at 0709-10, ¶ 47.
[19] *Id.* at 0709, ¶ 43; *id.* at 0709-10, ¶ 47; *id.* at 0712, ¶ 57; *id.* at 0714-5, ¶ 67.

on the bank accounts of E.M. Systems and EDG Tech.[20]  Short is the applicant or registrant for the mail drop addresses that are used by the scam.[21]  And Short is the signatory on factoring agreements between single-member LLC's and E.M. Systems that are used to process consumers' payments.[22]

Dyar is the owner and sole manager of KLS,[23] and the signatory on its bank accounts.[24] Dyar signs checks from KLS to pay for certain functions of the scam, including payments for printing the "Customized Budget Plans" that are sent to consumers and payments to the registrant of the websites for the scam's fictitious business names.[25]  Dyar is an authorized receiver of mail for the mail drop used by E.M. Systems and AM&D.[26]  She also registered the mail drop for at least one of the fictitious business names.[27]

Short and Dyar previously participated in a similar scam that also peddled purported credit-card-interest-rate-reduction services.  Dyar provided "fulfillment" services to the *Pro Credit* defendants that are similar to the services provided by KLS in the present scam.[28]  Short provided computer services to the *Pro Credit* scam.[29]  This Court extensively discussed Defendant Dyar's role in *Pro Credit* in its Order granting the FTC's Motion for Preliminary Injunction. *See Pro Credit Group*, Case No. 8:12-cv-00586-T-35EAJ, Oct. 17, 2010, Order, doc. 161 at pp. 3-4, 8-9, 11 (discussing the "fulfillment" services provided by Dyar and her company, CBS, and finding that "CBS, merely called the number on the back of the customers' credit cards

---

[20] Dandashly, App. 0714, ¶ 66; *id.* at 0716, ¶ 72.

[21] *Id.* at 0716, ¶ 73.

[22] *Id.* at 0720, ¶ 97. *See id.* at 0719-22, ¶¶ 95-100 (discussing factoring agreements).

[23] *Id.* at 0710, ¶ 49; App. 0717, ¶ 79.

[24] *Id.* at 0710, ¶¶ 51-52.

[25] *Id.* at 0711-2, ¶¶ 53-55.

[26] *Id.* at 0717, ¶ 83.

[27] *Id.* at 0717, 83.

[28] Castillo, App. 1679-82, ¶¶ 4-8.

[29] *Id.* at. 1682, ¶ 9.

6

to begin their negotiations[,] . . . only about 5 negotiators were available to service over 15,000 lenders[,] . . . [and] Defendants knew ahead of time that certain credit cards held by customers enrolled in their program were not eligible for reductions because the lenders would not negotiate").

### 2.   The One Easy Defendants

The "One Easy Defendants" consist of the E.M. Systems Defendants' largest domestic telemarketer, One Easy Solution LLC, and its owner, Christopher C. Miles:

*One Easy Solution LLC* ("One Easy") has received more than $1 million in bank transfers from E.M. Systems, and approximately $1.5 million from E.M. Systems' merchant service provider.[30] One Easy's telemarketing licensing documents include sales scripts that show that a preauthorization charge is placed on consumers' credit cards before any purported services are rendered.[31] The documents also describe One Easy's services of lowering the interest rate on consumers' credit cards.[32] Some of the complaints submitted by consumers about this scam include the names and license numbers of employees of One Easy.[33]

*Christopher C. Miles* is the owner and one of two managers of One Easy.[34] Until November 2014, Miles was the owner and sole manager of One Easy.[35] Miles signed One Easy's telemarketing applications that were filed with Florida regulators, which include sales scripts showing that an advance preauthorization charge is placed on consumers' credit cards, and that

---

[30] Dandashly, App. 0718-9, ¶ 90.
[31] *Id.* at 0718, ¶ 88.
[32] *Id.*
[33] *Id.* at 0718, ¶ 89.
[34] *Id.* at 0719, ¶ 92.
[35] *Id.*

One Easy is in the business of lowering consumers' interest rates on their credits.[36]  He is also

the signatory on One Easy's bank accounts.[37]

### C.      Defendants' Business Activities

Since at least January 2013, Defendants have engaged in a scheme to defraud consumers

through their debt relief scam, which they have carried out under numerous fictitious business

names with associated websites, including:

|    | Fictitious Business Name | Internet Domain Name |
|----|--------------------------|----------------------|
| a. | Applied Budgeting | (appliedbudgeting.com); |
| b. | Bigger Budget | (biggerbudget.com); |
| c. | Competitive Budgeting | (competitivebudgeting.com); |
| d. | Complete Budgeting | (completebudgeting.com); |
| e. | Conserved Budgeting | (conservedbudgeting.com); |
| f. | Consigned Savings | (consignedsavings.com): |
| g. | Decisive Budgeting | (decisivebudgeting.com); |
| h. | Efficient Budgeting | (efficientbudgeting.com); |
| i. | Insightful Budgeting | (insightfulbudgeting.com); |
| j. | Intuitive Budgeting | (intuitivebudgeting.com); |
| k. | Less Costly Living | (lesscostlyliving.com); |
| l. | Living Competitively | (livingcompetitively.com); |
| m. | Lowered Expenses | (loweredexpenses.com); |
| n. | Prepared Budgeting | (preparedbudgeting.com); |
| o. | Reduced Expenses | (reducedexpenses.com); |
| p. | Resourceful Budgeting | (resourcefulbudgeting.com); |
| q. | Sensible Budgeting | (sensiblebudgeting.com); |
| r. | Skilled Budgeting | (skilledbudgeting.com); |
| s. | Spend Less Monthly | (spendlessmonthly.com); |
| t. | Total Budgeting | (totalbudgeting.com); |
| u. | Today's Financial Living | (todaysfinancialliving.com); |
| v. | Your Household Budget | (yourhouseholdbudget.com); and |
| w. | Your Next Financial Step | (yournextfinancialstep.com).[38] |

### 1.      The Sales Pitch

Defendants contact consumers that have existing credit card debts through unsolicited

---

[36] Dandashly, App. 0718, ¶ 88.

[37] *Id.* at 0719, ¶ 93.

[38] *Id.* at 0698-9, ¶ 29.

telephone calls.[39]  In these unsolicited telephone calls, the E.M. Systems Defendants' telemarketers, including One Easy,[40] at the direction and under the control of the E.M. Systems Defendants,[41] identify themselves as being with "card services," "credit services," "card member services," or one of the unregistered fictitious businesses listed above.[42]

The telemarketers then often take steps to win consumers' trust and create an air of legitimacy to their sales pitch, including: (1) falsely stating that they are affiliated, or have business relationships with, consumers' lenders;[43] (2) providing the consumer with a license, ID, or badge number;[44] (3) directing consumers to the Internet domain name of the fictitious business name being used for the call;[45] and (4) telling consumers that they already have their personal information, such as the names of some of their credit cards and/or the amount of their credit card debt.[46]

After taking these initial steps to win consumers' trust, the telemarketers make the sales pitch. The telemarketers promise consumers that Defendants will negotiate directly with the consumers' credit card companies to obtain an interest rate reduction[47] and save them thousands of dollars on their credit card debts within a specific time period.[48] The telemarketers sometimes

---

[39] Dandashly, App. 0692, ¶ 8.

[40] *Id.* at 0718-20, ¶¶ 88-91.

[41] *Id.*

[42] *Id.* at App. 0692, ¶ 8. *See, e.g.,* Hurlman, App. 0256, ¶ 4; Beech, App. 0029, ¶ 2; Clark, App. 0051, ¶ 4; and Decker, App. 0119, ¶ 4.

[43] Dandashly, App. 0692, ¶ 9. *See, e.g.,* Decker, App. 0119, ¶ 4; Hurlman, App. 0256, ¶¶ 4-5; and McRavin, App. 0464, ¶ 6.

[44] Dandashly, App. 0692, ¶ 9. *See, e.g.,* Quintana, App. 0607, ¶ 7; Clark, App. 0054, ¶ 15; and Charon, App. 0048, ¶ 5.

[45] Dandashly, 0692, ¶ 9. *See, e.g.,* Hartnett, App. 0242, ¶ 9; Izquierdo, App. 0317, ¶ 8; Mathews, App. 0414, ¶ 8; and McRavin, App. 0464, ¶ 5.

[46] Dandashly, 0692, ¶ 9. *See, e.g.,* McRavin, App. 0464, ¶ 4; Clark, App. 0053, ¶ 14; and Hartnett, App. 0242, ¶ 3.

[47] Dandashly, App. 0692-3, ¶¶ 10-11. *See, e.g.,* Foley, App. 0165, ¶ 5; Hartnett, App. 0242, ¶ 6; Kruse, App. 0335, ¶ 3; and Little, App. 0372, ¶ 3.

[48] Dandashly, App. 0692-3, ¶¶ 10-11. *See, e.g.,* Gilson, App. 0225, ¶ 2; Hanshaw, App. 0239, ¶ 5; Hartnett, App. 0242, ¶ 6; and Hurlman, App. 0256, ¶ 5.

promise a specific interest rate (*e.g.*, a reduction to 6% or lower),[49] and a specific minimum amount of savings (*e.g.*, $5,000 amount of savings in ninety days).[50]

### 2.   The Advance Fee and Money Back Guarantee

The fee quoted by the telemarketers for the purported services is usually between $695 and $1,495.[51] The telemarketers convince consumers to pay the fee by promising that if they do not save thousands of dollars (usually between $2,500 and $5,000) within a short time period, then the consumers' fees will be refunded.[52] Consumers who decide to purchase Defendants' purported services are asked for their credit card numbers and billing information.[53] Defendants charge consumers' credit cards during the telemarketing call before any of the purported debt relief services are provided.[54] Consumers are told that they will receive a contract or service agreement and documents for their signature shortly and that they should promptly return those documents.[55]

### 3.   Consumers Do Not Receive What They Are Promised

After consumers pay the hefty up-front fee, Defendants typically send the consumers a package of documents with information about Defendants' purported services and forms for the

---

[49] Dandashly, App. 0692-3, ¶¶ 10-11. *See, e.g.*, Hurlman, App. 0257, ¶ 7; Kruse, App. 0335, ¶ 3; Mathews, App. 0414, ¶ 5, and Allen, App. 0015, ¶ 5.

[50] Dandashly, App. 0692-3, ¶¶ 10-11. *See, e.g.*, Obeidi, App. 0537-0538, ¶ 3; Scott, App. 0610, ¶ 5; Taylor, App. 0613, ¶ 8; and Thompson, App. 0617, ¶ 5.

[51] Dandashly, App. 0693, ¶ 11. *See, e.g.*, Bauer, App. 0018, ¶ 4; DuBois, App. 0151, ¶ 5; Charon, App. 0048, ¶ 10, and Obeidi, App. 0538-39, ¶ 3.

[52] Dandashly, App. 0693, ¶ 12; App. 694, ¶ 17. *See, e.g.*, Agresti, App. 0002, ¶ 7; Foley, App. 0165, ¶ 5; Gilson, App. 0225, ¶ 2; and Hanshaw, App. 0239, ¶ 6.

[53] Dandashly, App. 0693, ¶ 14. *See, e.g.*, Hanshaw, App. 0239, ¶ 8; Quintana, App. 0607, ¶ 10; Picard, App. 0585, ¶ 10; and Taylor, App. 0613, ¶ 6.

[54] Dandashly, App. 0693, ¶ 14. *See, e.g.*, Valentine, App. 0633, ¶ 5; Bauer, App. 0018, ¶ 4; Beech, App. 0028, ¶ 7; and Charon, App. 0048, ¶ 10.

[55] Dandashly, App. 0693, ¶ 14. *See, e.g.*, Charon, App. 0048, ¶ 11; Cline, App. 0079, ¶ 11; Hurlman, App. 0257, ¶ 8; and Little, App. 0372, ¶ 7.

10

consumers to fill out and return.[56]   Often among these documents sent by Defendants is a "Frequently Asked Questions" guide that reiterates the promise that Defendants "simply and aggressively negotiates with your creditor(s) to provide you with substantial savings."[57]

For consumers who complete and return the forms, Defendants then sometimes send a "Customized Budget Plan," which simply provides consumers with obvious advice such as that paying more than the minimum payments each month will result in the credit card debt being paid off faster.[58]  Defendants rarely, if ever, provide the interest rate reductions and savings that they promise to consumers.[59]

Although Defendants promise consumers that they can obtain a full refund if they do not save thousands of dollars within a certain number of days, Defendants frequently do not honor this money-back guarantee.[60]  Not only do Defendants frequently refuse to give refunds, they also sometimes threaten consumers or subject them to abusive language when they attempt to obtain refunds from Defendants.[61]

In sum, Defendants do not keep their promises to consumers: Defendants typically do not obtain lower interest rates for consumers;[62] do not save consumers thousands of dollars in a short

---

[56] Dandashly, App. 0694, ¶ 15. *See, e.g.,* Mathews, App. 0415, ¶ 10; Allen, App. 0015, ¶ 10; Quintana, App. 0607, ¶ 12; and Scott, App. 0610, ¶ 8.

[57] Dandashly, App. 0694, ¶¶ 15-16. *See, e.g.,* Thompson, App. 0626; Beech, App. 0041; Clark, App. 0066; and Cline, App. 0089.

[58] Dandashly, App. 0695, ¶ 21. *See, e.g.,* Mathews, App. 0416, ¶ 17; Obeidi, App. 0564; and Cline, App. 0081, ¶ 21.

[59] Dandashly, App. 0693 ¶, 13. *See, e.g.,* Cline, App. 0081, ¶¶ 21-23; Decker, App. 0120, ¶ 10; Dubois, App. 0152, ¶¶ 14-16; and Foley, App. 0167, ¶ 22.

[60] Dandashly, App. 0696, ¶ 22 13. *See, e.g.,* Allen, App. 0016, ¶ 20, Cline, App. 0081, ¶ 24; Foley App. 0169, ¶ 30; Harnett, App. 0244, ¶ 21; Mathews, App. 0417, ¶ 22; McRavin, App. 0468, ¶ 29; and Obeidi, App. 0540, ¶ 8.

[61] Dandashly, App. 0696, ¶ 22. *See, e.g.,* Izquierdo, App. 0318, ¶ 10; Mathews, App. 0416, ¶ 19; and Hartnett, App. 0243-0244, ¶ 10.

[62] Dandashly, App. 0693, ¶ 13. *See, e.g.,* Bauer, App. 0020, ¶ 15; Cline, App. 0081, ¶ 24; Foley, App. 0168, ¶ 28; Harnett, App. 0244, ¶ 20; and Mathews, App. 0417, ¶ 22.

time period;[63] and do not return consumers' money.[64] Instead, consumers who fall prey to the Debt Relief Scam often end up more indebted than before because of Defendants' hefty fees.[65]

### D.   The Scam's Efforts to Hide Its Conduct

The scam appears to anticipate law enforcement efforts to halt its conduct. As explained above, the scam operates through a web of entities and fictitious business name. Likewise, the numerous unregistered fictitious names and mail drops also suggest an intent to avoid law enforcement. The multiple names used by the scam make it harder for consumers to know with whom they are really dealing, and make it less likely that the scam will be detected.

The scam also attempts to cloak its processing of consumers' payments behind a curtain of factoring agreements.[66] These factoring agreements consist of individuals who, in return for a small portion of processing revenue, establish merchant accounts through single-owner businesses.[67] These merchant accounts are used to process consumers' payments, of which more than 90% typically is sent to E.M. Systems.[68] E.M. Systems then uses the money it receives to fund the other participants in the scam.[69]

Finally, the E.M. LLC's have transferred more than $3.5 million abroad, including more than $2.5 million to Pakistan.[70]

### ARGUMENT

As noted in the Introduction, the FTC has filed several cases against perpetrators of

---

[63] Dandashly, App. 0693, ¶ 13. *See, e.g.,* Agresti, App. 0002, ¶ 7; Foley, App. 0165, ¶ 5; Gilson, App. 0225, ¶ 2; Harnett, App. 0244, ¶ 20, and Hanshaw, App. 0239, ¶ 6

[64] Dandashly, App. 0693, ¶ 13. *See, e.g.,* Allen, App. 0016, ¶ 20, Cline, App. 0081, ¶ 24; Foley, App. 0169, ¶ 30; Harnett, App. 0244, ¶ 21; Mathews, App. 0417, ¶ 22; McRavin, App. 0468, ¶ 29; and Obeidi, App. 0540, ¶ 8.

[65] *See, e.g.,* Quintana, App. 0608, ¶¶ 22-23; Thompson, App. 0620, ¶ 25; Valentine, App. 0635, ¶ 16; Mathews, App. 0417, ¶ 22; McRavin, App. 0468, ¶ 29; and Obeidi, App. 0540, ¶ 8.

[66] Dandashly, App. 0719-22, ¶¶ 95-100.

[67] Dandashly, App. 0720, ¶ 96.

[68] Dandashly, App. 0720, ¶ 97.

[69] *See supra* pp. 4-6.

[70] Dandashly, App. 0713, ¶ 60.

similar scams, and district courts regularly have entered *ex parte* temporary restraining orders with relief similar to that requested here.[71] In this case, as in others prosecuted by the FTC, Plaintiffs move for four separate but related forms of relief, and present separate arguments below as to each.

*First*, Plaintiffs demonstrate that a temporary restraining order is necessary to prevent Defendants from continuing to perpetrate their scam. As part of that showing, Plaintiffs demonstrate that they are likely to prevail on the merits of their claims under the FTC Act, TSR, and FDUTPA, and that a temporary restraining order preventing Defendants from perpetrating their scam is in the public interest.

*Second*, Plaintiffs demonstrate that an asset freeze is necessary to prevent Defendants from hiding fraudulently obtained assets and destroying evidence.

*Third*, Plaintiffs demonstrate the need for an immediate access and appointment of a temporary receiver over the corporate Defendants to protect assets and evidence held by the corporations, and to maintain the status quo.

*Fourth*, in the last section of the Argument, Plaintiffs demonstrate that the Court should consider this motion, and provide the requested relief, on an *ex parte* basis.

## I. A TEMPORARY RESTRAINING ORDER IS NECESSARY TO PREVENT DEFENDANTS FROM CONTINUING TO PERPETRATE THEIR SCAM

This Court may issue a temporary restraining order to prevent a defendant from violating

---

[71] *See, e.g., FTC v. Pro Credit Group,* Case No. 8:12-cv-00586-T-35EAJ, Mar. 20, 2012, Order, doc. 11-1 (M.D. Fla.); *FTC v. Innovative Wealth Builders,* Case No. 8:12-cv-00586-T-33EAJ, Jan. 14, 2013, Order, doc. 11 (M.D. Fla.); *FTC. v. Economic Relief Technologies, LLC,* Case No. 1:09-cv-03347-TCB, Nov. 30, 2009, Order, doc. 10 (N.D. Ga.); *FTC. v. 2145183 Ontario Inc.,* Case No. 1:09-cv-07423, Nov. 30, 2009, Order, doc. 16 (N.D. Ill.); *FTC v. Ambrosia Web Design LLC,* Case No. 2:12-cv-02248-FJM, Oct. 22, 2012, Order. Doc. 13-1 (D. Ariz.); *FTC v. The Green Savers, LLC,* Case No. 6:12-cv-01588-JA-DAB, Oct. 22, 2012, Order, doc. 14 (M.D. Fla.); *FTC v. ELH Consulting, LLC,* Case. No. 2:12-cv-02246-FJM, Oct. 22, 2012, Order, doc. 10 (D. Ariz.); *FTC. v. Advanced Management Services NW LLC,* Case No. 2:10-cv-00148-LRS, May 10, 2010, Order, doc. 10 (E.D. Wash.); *FTC. v. JPM Accelerated Services, Inc.,* Case No. 6:09-cv-02021-JA-KRS, Nov. 20, 2009, Order, doc. 9 (M.D. Fla.) and *FTC v. A+ Financial Center,* Case No. 2:12-cv-14373-DLG, Oct. 24, 2012, Order doc. 10 (S.D. Fla.).

the FTC Act. That power may be employed where the FTC seeks a temporary restraining order before filing an administrative complaint, 15 U.S.C. § 53(b), or where, as here, the FTC seeks a temporary restraining order as part of a civil action seeking permanent injunctive relief, 15 U.S.C. § 53(b) (second proviso, "Provided further, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."). Indeed, the full range of this Court's "inherent equitable powers may be employed . . . during the pendency of an action for permanent injunctive relief." *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984).

The factors considered in ruling on a motion for a temporary restraining order "mirror" those considered on a motion for a preliminary injunction. 11A Federal Practice & Procedure § 2951 (3d ed.); *see Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005) (same). In determining whether to issue a temporary restraining order (or preliminary injunction), the Court should not require the Plaintiffs to "satisfy the traditional equity standard that courts impose on private litigants." *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217-18 (11th Cir. 1991). Plaintiffs are subject to a lighter burden. As the House Conference Report on the relevant FTC Act provision notes, the traditional equity standard "is not . . . appropriate for the implementation of a Federal statute by an independent regulatory agency where the standards of the public interest measure the propriety and the need for injunctive relief." H.R. Rep. No. 93-624 (1973), reprinted in 1973 U.S.C.C.A.N. 2523, 2533.

Accordingly, when Plaintiffs seek a temporary restraining order under the FTC Act or the TSR, the order should issue where, as here, Plaintiffs demonstrate that (1) they are "likely to succeed on the merits" and (2) the requested order is "in the public interest." *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014). Irreparable injury need not be shown. *Id.*

14

Notably, under FDUTPA the Florida Attorney General need not show public interest, but rather, only has to show the likelihood of success on the merits. *Millennium Commc'ns & Fulfillment, Inc. v. Florida*, 761 So. 2d 1256, 1260 (Fla. 3d DCA 2000) (because section 501.207(1)(b) expressly authorizes the Department to seek injunctive relief on behalf of the state, the Department does not have to establish irreparable harm, lack of an adequate legal remedy or public interest."). In determining whether Plaintiffs have met their burden, this Court may rely on any evidence, including "affidavits and hearsay materials which would not be admissible evidence for a permanent injunction." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995); *see Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (stating that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings.").

**A.   Plaintiffs Are Likely To Succeed On The Merits Of Their Claims Under Section 5 Of The FTC Act And Section 501.204 Of FDUTPA (Counts I And V).**

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).[72] A defendant is liable under Section 5 for making false or misleading representations if the defendant (1) made a representation (2) that was likely to

---

[72] Throughout the argument as to Defendants' liability under Section 5(a) the FTC Act and Section 501.204 of FDUTPA, Plaintiffs cite cases brought under the FTC Act. That is because conduct that violates Section 5(a) of FTC Act also violates Section 501.204 of the FDUTPA. *See FTC v. Info. Mgmt. Forum, Inc.*, No. 6:12-cv-986, 2013 WL 3323635, at *5 (M.D. Fla. June 28, 2013) ("Conduct that constitutes a 'deceptive act or practice' . . . under the FTC Act is a violation of [Section 501.204 of the FDUTPA]."); FLA. STAT. ANN. § 501.204 (providing that in construing Section 501.204 "great weight shall be given" to the federal courts' interpretations of Section 5 of the FTC Act); *Millennium Commc'ns & Fulfillment, Inc. v. Florida*, 761 So. 2d 1256, 1260 (Fla. 3d DCA 2000) (noting "great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to the FTC Act"). To that end, the Florida Supreme Court has held that a deceptive practice is one which "involves a material representation or omission that is likely to mislead consumers acting reasonably under the circumstances." *See PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

mislead consumers acting reasonably under the circumstances and (3) the representation was material. *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (citations omitted).

To succeed on a misrepresentation claim under Section 5, the FTC "need not prove that the representations at issue were done with intent to defraud or deceive." *FTC v. Inbound Call Experts, LLC*, No. 14-81395-CIV, 2014 WL 8105107, at *3 (S.D. Fla. Dec. 23, 2014) (citing *FTC v. Free Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005)). "'Instead, the 'cardinal factor' in determining whether an act or practice is deceptive under § 5 is the likely effect the promoter's handiwork will have on the mind of the ordinary consumer.'" *Id.* (quoting *FTC v. Sterling Drug*, 317 F.2d 669, 674 (2d Cir. 1963)). Further, neither proof of consumer reliance nor proof of consumer injury is necessary to establish a Section 5 violation. *Free Commc'ns, Inc.*, 401 F.3d at 1203. The purported value of the product sold is also irrelevant: "the salient issue in fraudulent-misrepresentation cases 'is whether the seller's misrepresentations tainted the customer's purchasing decisions,' not the value (if any) of the items sold." *IAB Mktg. Assocs., LP*, 746 F.3d at 1235 (citations omitted).

### 1. Defendants Make Representations

The E.M. Systems Defendants pay telemarketers, including One Easy, to cold call consumers and pitch their purported services.[73] The telemarketers routinely make at least four representations during these calls: (i) Defendants are affiliated, or have established business relationships, with consumers' lenders;[74] (ii) Consumers who purchase Defendants' debt relief

---

[73] Dandashly, App. 0719, ¶ 90.
[74] *See, e.g.*, Bauer, App. 0018, ¶ 3; Clark, App. 0051, ¶ 5; Decker, App. 0119 ¶ 3; Hurlman, App. 0256, ¶¶ 4-5; Izquierdo, App. 0316, ¶ 4; McRavin, App. 0465, ¶ 6.

services will have their credit card interest rates reduced;[75] (iii) Consumers who purchase Defendants' debt relief services will save thousands of dollars in a short time period;[76] and (iv) Defendants will provide full refunds if consumers do not save thousands of dollars in a short time period.[77] These representations—which, as shown below, are both likely to mislead consumers and material—are at the core of Plaintiffs' claims for relief.

### 2. Defendants' Representations Mislead Consumers

Each of these representations is likely to mislead consumers. Whether a representation is likely to mislead consumers is "evaluated from the perspective of the reasonable prospective purchaser, that is, a reasonable consumer in the audience targeted by the advertisement." *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1272 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013). "Only a tendency to deceive is required; actual deception is unnecessary." *Id.* at 1273 (citations omitted).

That these representations tend to deceive reasonable consumers is apparent for at least two reasons. *First*, a representation is likely to mislead if it has the capacity or tendency to deceive; that is, it is either false or lacks a reasonable basis. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994). Defendants' representations are false, as the consumer declarations submitted with this motion confirm. Defendants do not have business relationships with consumers' lenders.[78] Consumers who purchase Defendants' purported services do not have their credit card interest rates reduced and do not save thousands of dollars in a short time

---

[75] *See, e.g.*, Bauer, App. 0018, ¶ 3; Clark, App. 0052, ¶ 9; Cline, App. 0078, ¶ 7; Foley, App. 0165, ¶ 5; Harnett, App. 0242, ¶ 6; Kruse, App. 0335, ¶ 3; Mathews, App. 0414, ¶ 8; McRavin, App. 0464, ¶ 4; Obeidi, App. 0537-8, ¶ 3; Valentine, App. 0633, ¶ 4.

[76] *See, e.g.*, Bauer, App. 0018, ¶ 4; Clark, App. 0052, ¶ 10; Cline, App. 0078, ¶ 7; Foley, App. 0165, ¶ 5; Harnett, App. 0242, ¶ 6; Mathews, App. 0414, ¶ 6; Obeidi, App. 0537-8, ¶ 3; Valentine, App. 0633, ¶ 4.

[77] *See, e.g.*, Bauer, App. 0018, ¶ 4; Cline, App. 0078, ¶ 8; Foley, App. 0165, ¶ 5; Mathews, App. 0414, ¶ 6; McRavin, App. 0465, ¶ 8; Obeidi, App. 0537-8, ¶ 3; Valentine, App. 0633, ¶ 4.

[78] Dandashly, App. 0693, ¶ 13. Clark, App. 0054-55, ¶ 15.

period.[79]   Defendants do not typically provide full refunds when consumers do not save thousands of dollars in a short time period.[80]

*Second*, although actual deception is unnecessary, evidence—like that presented here— that consumers are actually deceived is "highly probative to show that a practice is likely to mislead consumers." *FTC v. Direct Benefits Grp., LLC*, No. 6:11-CV-1186-ORL-28TBS, 2013 WL 3771322, at *15 (M.D. Fla. July 18, 2013) (citation and quotation marks omitted). Here, many consumers were in fact deceived by Defendants' misrepresentations.[81]

### 3.   Defendants' Representations are Material

Each of these representations is also material.   Whether a representation is material, like the question whether a representation is likely to mislead consumers, is evaluated from the perspective of the "reasonable prospective purchaser." *Wash. Data*, 856 F. Supp. 2d at 1272.   A representation is material "if it is of a kind usually relied upon by a reasonably prudent person." *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007).   Only a tendency to affect consumer's reliance is required; "subjective reliance by each victim" is not required. *Id.* at 1267 (citation omitted).

That Defendants' representations are material is apparent for at least three reasons. *First*, Defendants make express representations,[82] and express representations are presumptively material. *Id.* ("Express claims, or deliberately-made implied claims used to induce the purchase

---

[79] *See, e.g.*, Bauer, App. 0020, ¶ 15; Cline, App. 0081, ¶ 24; Foley, App. 0168, ¶ 28; Harnett, 0244, ¶ 20; Mathews, App. 0417, ¶ 22; McRavin, App. 0468, ¶ 29; Obeidi, App. 0540, ¶ 8; Valentine, App. 0635, ¶ 15.

[80] *See, e.g.*; Allen, App. 0016, ¶ 20; Cline, App. 0081, ¶ 24; Foley, App. 0169, ¶ 30; Harnett, 0244, ¶ 20; Mathews, App. 0417, ¶ 22; McRavin, App. 0468, ¶ 29; Obeidi, App. 0540, ¶ 8; Valentine, App. 0635, ¶ 15.

[81] *See* App. 0001-0635 (declarations of 26 consumers deceived by Defendants' misrepresentations).

[82] *See, e.g.*, Agresti, App. 0002, ¶ 5-8; Foley, App. 0165, ¶ 5; Harnett, App. 0242, ¶ 6; Hurlman, App. 0258, ¶ 12; Izquierdo, App. 0316, ¶ 4-5; Kruse, App. 0335, ¶ 3; Little, App. 0372, ¶ 5.

of a particular product or service are presumed to be material."); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999).

*Second*, representations that go to "the heart of a consumer's decision to purchase" a product or service are presumptively material. *FTC v. USA Beverages, Inc.*, No. 05-61682, 2005 WL 5654219, at \*6 (S.D. Fla. Dec. 6, 2005), *report and recommendation adopted*, No. 05-61682, 2005 WL 5643834 (S.D. Fla. Dec. 9, 2005). Defendants' representations go to the heart of consumers' decisions to pay substantial sums of money for interest rate reductions and debt savings that they never receive. Many consumers are deceived by Defendants' misrepresentations and, for that reason, agree to be charged.[83]

*Third*, representations that produce consumer injury are material. *See FTC Policy Statement On Deception*, 103 F.T.C. 174, 183 (1984) ("Injury exists if consumers would have chosen differently but for the deception. If different choices are likely, the claim is material, and injury is likely as well. Thus, injury and materiality are different names for the same concept."). Defendants have injured numerous consumers by defrauding them of millions of dollars, and that itself is evidence sufficient to demonstrate that Defendants' representations are material.

### B. Plaintiffs Are Likely To Succeed On The Merits Of Their Claims Under The TSR (Counts II-IV)

Plaintiffs are likely to prevail on Counts II-IV of the Complaint, which are for Defendants' violations of the TSR.

The TSR was promulgated by the FTC pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to prohibit abusive and deceptive telemarketing acts or practices. Pursuant to Section 3(c) of the

---

[83] *See, e.g.,* Allen, App. 0015, ¶ 6; Izquierdo, App. 0316, ¶ 6; Kruse, App. 0336, ¶ 5; McRavin, App. 0465, ¶ 9; Obeidi 0537-8, ¶ 3; Taylor, App. 0613, ¶ 10.

Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

Defendants are "sellers" under the TSR because they, "in connection with a telemarketing transaction, provide[] . . . or arrange[] others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2a(z). The services offered by Defendants are "debt relief services" as that term is defined under the TSR because they involve "a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor." 16 C.F.R. § 310.2(m).

Counts II and III of the Complaint charge Defendants with violating 16 C.F.R. §§ 310.3(a)(2)(x) and (iv) for making the same representations that form the basis of Counts I and V, namely: (i) Defendants are affiliated, or have established business relationships, with consumers' lenders; (ii) Consumers who purchase Defendants' debt relief services will have their credit card interest rates reduced; (iii) Consumers who purchase Defendants' debt relief services will save thousands of dollars in a short time period; and (4) Defendants will provide full refunds if consumers do not save thousands of dollars in a short time period. As explained in detail above, these representations are false and misleading because Defendants rarely, if ever, fulfill their promises. Plaintiffs are thus likely to prevail on Counts II and III under the TSR just as they are likely to prevail on Counts I and V under the FTC Act and FDUTPA.

Plaintiffs are also likely to prevail on Count IV, which charges Defendants with violating the TSR's prohibition on collecting an advance fee for debt relief services. Under the TSR, a seller or telemarketer may not request or receive payment of any fee or consideration for any debt relief service until and unless the seller or telemarketer has renegotiated, settled, reduced, or

otherwise altered the terms of at least one debt on behalf of the customer.  16 C.F.R. § 310.3(a); 310.4(a)(5)(i).  Defendants routinely charge consumers approximately $1,000 during the initial sales call before any of the purported services are provided (*see supra* p. 10), and thus are violating the TSR.

### C.   Defendants' Liability

#### 1.   Corporate Liability of One Easy and the E.M. LLC's

One Easy's liability is premised on its own conduct.  As the EM Systems Defendants' largest domestic telemarketer, One Easy has received more than $2.5 million from E.M. Systems and its merchant service provider.[84]  Consumer complaints link misrepresentations to One Easy, and the sales scripts that it has filed with state regulators demonstrate it charges an advance fee for debt relief services.[85]

The E.M. LLC's are liable because they hire telemarketers, such as One Easy, that make misrepresentations to consumers and charge advance fees to consumers.  Under the FTC Act, a defendant is liable for the conduct of third party telemarketers that act as its agent. *Pro Credit Group*, No. 8:12-cv-00586-T-35EAJ at *7 (citing *FTC v. MacGregor*, 360 F. App'x. 891 (9th Cir. 2009); *FTC v. Stefanchik*, 559 F.3d 924, 930-31 (9th Cir. 2009)).  Here, bank records establish that E.M. Systems paid millions of dollars to telemarketers, including One Easy, to market the E.M. LLC's purported debt relief services.[86]  Because E.M. Systems hired the telemarketers, it is liable for their misrepresentations.  Each of the other E.M. LLC's is jointly liable with E.M. Systems because they all operate as a common enterprise.

"When corporations act as a common enterprise, each may be held liable for the

---

[84] Dandashly, App. 0718-9, ¶ 90.
[85] *Id.* at 0718, ¶ 88.
[86] *Id.* at 0718, ¶ 90.

deceptive acts and practices of the other." *FTC v. Direct Benefits Grp, LLC*, 2013 WL 3771322 at *18 (citation and quotation marks omitted). "[I]n situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with a clear mechanism for avoiding the terms of the order, courts have been willing to find the existence of a common enterprise." *FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009) (citation omitted). There is no set formula for determining whether a common enterprise exists. Instead, "[c]ourts consider a variety of factors, including: common control, the sharing of office space and officers, whether the business is transacted through a maze of interrelated companies, unified advertising, and evidence which reveals that no real distinction existed between the [c]orporate [d]efendants." *FTC v. Direct Benefits Grp., LLC*, 2013 WL 3771322 at *18 (citation and quotation marks omitted). "When determining whether a common enterprise exists, 'the pattern and frame-work of the whole enterprise must be taken into consideration.'" *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1182.

The evidence here demonstrates that the E.M. LLC's act as a common enterprise. *First*, the E.M. LLC's operate together to carry out the scam through unified advertising under the umbrella of various fictitious business names. Each of the E.M. LLC's plays an integral role in operating the scam under the fictitious business names. *Second*, all of the E.M. LLC's are under the common control of Short or Dyar, who are married to each other and who operate the business together. *Third*, money from the scam is freely distributed among the E.M. LLC's to further perpetuate its operations, with the only consideration provided being the services that each performs for the scam. In sum, the activities of the E.M. LLC's, taken as a whole, demonstrate that the E.M. LLC's act as a common enterprise. Each of the E.M. LLC's is thus

jointly liable for all of the E.M. LLC's wrongful acts, including E.M. Systems' engagement of telemarketers such as One Easy.

## 2. Individual Liability of Dyar, Short, and Miles

An individual defendant is liable for corporate practices that violate Section 5 of the FTC Act, if the defendant (1) had "some knowledge of the practices" and (2) either "participated directly in the practices" or "had authority to control them." *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996)(citation and quotation marks omitted). Circumstantial evidence is sufficient to establish that a defendant had "requisite knowledge" of a deceptive or fraudulent practice, *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013), and a defendant's "degree of participation in business [affairs] is probative of knowledge." *Transnet Wireless*, 506 F. Supp. 2d at 1270 (citation and quotation marks omitted). In addition, even if there is no evidence that a defendant participated directly in a fraudulent practice, "[a]uthority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *FTC v. Amy Travel Serv.*, 875 F.2d 564, 573 (7th Cir. 1989) (citations omitted); *see IAB Mktg. Assocs. LP*, 746 F.3d at 1233 (same). In fact, a defendant's "status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." *Transnet Wireless*, 506 F. Supp. 2d at 1270 (citation and quotation marks omitted).

Both Short and Dyar know about and participate directly in and control the scam. They are the sole member managers and owners of the E.M LLC's, which form the nucleus of the scam. Further, both Short and Dyar participated in a similar scam that was the subject of a prior, recent FTC enforcement action. Because Short and Dyar know about and participate directly in and control the scam, they are each individually liable for the practices of the E.M. LLC's.

23

Likewise, Defendant Miles is individually liable for the practices of One Easy because he knows about and participates directly in and controls One Easy. Miles is the sole owner and one of two managers of One Easy (he was the sole manager until November 2014). Mr. Miles is the signatory on One Easy's bank accounts, and he signed One Easy's telemarketing applications that were filed with Florida regulators. These telemarketing applications include sales scripts showing that One Easy claims to provide credit card interest rate reduction services, and places preauthorization charges on consumers' credit cards before any purported services are provided.

### D.    A Temporary Restraining Order Is In The Public Interest

A temporary restraining order prohibiting Defendants from continuing to perpetrate their debt relief scam is in the public interest. It is well established that Plaintiffs' efforts to "protect the purchasing public against deceptive methods and misrepresentations by which purchasers are deceived . . . [are] in the public interest." *FTC v. Rhodes Pharmacal Co.*, 191 F.2d 744, 747 (7th Cir. 1951). The "principal equity weighing in favor of" injunctive relief is thus "the public's interest in effective enforcement" of the FTC Act, which is "intended to safeguard . . . consumers." *Univ. Health*, 938 F.2d at 1225 (citation and quotation marks omitted). Indeed, as the Second Circuit has noted, the passage of a statute prohibiting conduct, like Section 5's prohibition of false and misleading representations, "is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained." *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 28 (2d Cir. 1972); *see* 11A Fed. Prac. & Proc. Civ. § 2948.4 (3d ed.) ("A federal statute prohibiting the threatened acts that are the subject matter of the litigation has been considered a strong factor in favor of granting a preliminary injunction."). Accordingly, where, as here, Plaintiffs have demonstrated that they are likely to succeed on the merits, *see*,

24

*supra*, at 15-21, defendants "face a difficult task in justifying the nonissuance of a preliminary injunction." *Univ. Health*, 938 F.2d at 1225.

The public's interest in preventing Defendants from continuing to perpetrate their debt relief scam far outweighs any private interest Defendants may have in continuing to perpetrate it. Defendants "have no vested interest in a business activity found to be illegal." *Diapulse*, 457 F.2d at 29 (citation and quotation marks omitted). And even if Defendants were able to assert legitimate interests that would be harmed by a temporary restraining order, the Court should "afford such concerns little weight, lest [it] undermine [the FTC Act's] purpose of protecting the 'public-at-large.'" *Univ. Health*, 938 F.2d at 1225 (citation and quotation marks omitted); *see FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984) ("When the [FTC] demonstrates a likelihood of ultimate success, a counter showing of private equities alone does not justify denial of a preliminary injunction."). Indeed, even if Defendants independently halt their deceptive practices, injunctive relief is appropriate where, as here, past conduct indicates that "there is a reasonable likelihood of further violations in the future." *FTC v. USA Fin., LLC*, 415 F. App'x 970, 975 (11th Cir. 2011) (citation and quotation marks omitted); *see also SEC v. Caterinicchia*, 613 F. 2d 102, 105 (5th Cir. 1980).

\*       \*       \*

In sum, Plaintiffs are likely to succeed on the merits of their claims that Defendants are violating the FTC Act, TSR, and FDUTPA by making false and misleading statements to consumers as part of a debt relief scam, and violating the TSR by charging an advance fee. Moreover, a temporary restraining order prohibiting Defendants from continuing to perpetrate their debt relief scam is in the public interest. Accordingly, the Court should grant Plaintiffs' request for a temporary restraining order.

## II.   AN ASSET FREEZE IS NECESSARY TO PRESERVE ASSETS FOR FINAL RELIEF INCLUDING REDRESS TO CONSUMERS

This Court not only has power to issue a temporary restraining order, but also "has the inherent power of a court of equity to grant ancillary relief, including freezing assets." *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984). An asset freeze is appropriate when necessary "to assure the availability of permanent relief." *Levi Strauss & Co v. Sunrise Int'l Trading, Inc.*, 51 F.3d at 987; *FTC v. Gem Merch. Corp.*, 87 F.3d at 469 ("[A] district court may order preliminary relief, including an asset freeze, that may be needed to make permanent relief possible."). "The FTC's burden of proof in the asset-freeze context is relatively light." *IAB Mktg. Assocs., LP*, 746 F.3d at 1234. All that is necessary is a "reasonable approximation of a defendant's ill-gotten gains." *Id.* (citation and quotation marks omitted); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) ("Since the [frozen] assets in question here were profits the [defendants] made by unlawfully stealing [the plaintiff's] services, the freeze was appropriate and may remain in place pending final disposition of the case.").

Here, the possibility of permanent relief—*i.e.*, consumer redress—will be jeopardized unless the Court issues the requested asset freeze. The E.M. Systems Defendants' bank account records show that they took more than $8 million from consumers,[87] of which more than $1 million was paid to the One Easy Defendants.[88] The possibility of a large monetary judgment depriving Defendants of the fruits of their illicit labor provide them with ample incentive to conceal or dissipate otherwise recoverable assets. Accordingly, the Court should grant Plaintiffs' request for an asset freeze.

---

[87] Dandashly, App. 0691, ¶ 4.

[88] One Easy received more than $1 million directly from E.M. Systems. Dandashly, App. 0719, ¶ 90. One Easy received almost $1.5 million from E.M. Systems' merchant service provider. *Id.* One Easy's manager, Miles, received $20,000 from EDT Tech. *Id.* at 0715, ¶ 71.

III.    APPOINTMENT OF A TEMPORARY RECEIVER OVER THE CORPORATE
        DEFENDANTS AND IMMEDIATE ACCESS IS NECESSARY TO PROTECT
        ASSETS AND EVIDENCE HELD BY THE CORPORATE DEFENDANTS, AND
        TO MAINTAIN THE STATUS QUO

In similar actions involving fraudulent conduct, courts have regularly exercised their

equitable authority to appoint a temporary receiver over corporate defendants and to grant

plaintiffs immediate access to defendants' records. *See supra* note 71, at p. 13 (citing similar

cases where courts have appointed a temporary receiver).

Appointment of receiver and immediate access is warranted here because of the

fraudulent nature of Defendants' scheme and the extensive harm injury that consumers have

already sustained.  A temporary receiver will ensure that the corporate Defendants do not engage

in unlawful activity during the pendency of this action and do not destroy critical evidence about

the scope of Defendants' fraud, thereby increasing the possibility that this Court will be able to

provide effective final relief at the termination of this action.  Granting Plaintiffs' immediate

access to documents and records will likewise shine light on the extent of Defendants' fraud and

bolster the possibility of final effective relief.

IV.    AN *EX PARTE* ORDER IS NECESSARY BECAUSE DEFENDANTS ARE
       LIKELY TO HIDE FRAUDULENTLY OBTAINED ASSETS AND DESTROY
       EVIDENCE IF THEY ARE INFORMED OF THIS ACTION

This Court should issue an order *ex parte* where, as here, "providing notice to the

defendant would render fruitless the further prosecution of the action." *AT&T Broadband v.

Tech Commc'ns, Inc.*, 381 F.3d 1309, 1319-20 (11th Cir. 2004) (citation and quotation marks

omitted).

A moving party can establish that an *ex parte* order is necessary with an attorney

declaration that offers evidence that a defendant is likely to hide fraudulently obtained assets or

destroy evidence if informed of an action.  For instance, in *AT&T Broadband*, the Eleventh

27

Circuit held that it was appropriate for a district court to issue an *ex parte* order where the moving party submitted an attorney affidavit "detailing numerous instances where defendants charged" with similar violations had "destroyed or transferred records, evidence, and assets." *Id.* at 1319. Similarly, in *In re Vuitton et Fils, S.A.*, the Second Circuit held that a district court erred in denying a request for an *ex parte* order where the moving party presented evidence based on its past experience that, if given notice, the defendant would "immediately transfer his inventory to another counterfeit seller, whose identity would be unknown." 606 F.2d 1, 2-3 (2d Cir. 1979).

Defendants are likely to hide fraudulently obtained assets and destroy evidence if they are informed of this action. As stated above, Defendants' conduct evinces a conscious effort to avoid law enforcement, and it is thus likely that Defendants will take additional steps to avoid liability—including hiding fraudulently obtained assets and evidence, if they are informed of this action. Further, Defendant Short and Dyar have demonstrated their resolve to violate the law by engaging in the exact same conduct that led this Court to grant strong preliminary and final relief against the *Pro Credit* defendants. Accordingly, the Court should provide the requested relief, on an *ex parte* basis.

## CONCLUSION

For all the reasons stated above, Plaintiffs respectfully request that the Court issue an *ex parte* temporary restraining order including an asset freeze, immediate access, appointment of a receiver, limited expedited discovery, and order to show cause why a preliminary injunction should not issue.

Dated:  June 16, 2015                          Respectfully submitted,


FEDERAL TRADE COMMISSION                       OFFICE OF THE ATTORNEY GENERAL
                                               THE STATE OF FLORIDA,
                                               DEPARTMENT OF LEGAL AFFAIRS

s/ S. Spencer Elg
S. Spencer Elg, GA Bar #940592                 Pamela Jo Bondi
selg@ftc.gov                                   Attorney General
Nicholas M. May, DC Bar #979754
nmay@ftc .gov
Anna M. Burns, GA Bar #558234                  s/ Amanda Arnold Sansone
aburns@ftc.gov                                 Amanda Arnold Sansone, FL Bar #587311
225 Peachtree Street NE, Ste 1500              amanda.sansone@myfloridalegal.com
Atlanta, GA 30303                              Jennifer Hayes Pinder, FL Bar #017325
Phone: 404-656-1354 (Elg)                      jennifer.pinder@myfloridalegal.com
       404-656-1360 (May)                      3507 East Frontage Road #325
       404-656-1350 (Burns)                    Tampa, Florida 33607
Fax:   404-656-1390                            Phone: 813-287-7950
                                               Fax: 813-281-5515

29