**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**FEDERAL TRADE COMMISSION** and
**OFFICE OF THE ATTORNEY GENERAL,**
**STATE OF FLORIDA,**
**DEPARTMENT OF LEGAL AFFAIRS**,

        Plaintiffs,

v.                                    Case No.:  8:15-cv-1417-T-23EAJ

**E.M. SYSTEMS & SERVICES, LLC**, a Florida
limited liability company; **ADMINISTRATIVE**
**MANAGEMENT & DESIGN, LLC**, a Florida
limited liability company; **KLS INDUSTRIES, LLC,**
**d/b/a SATISFIED SERVICE SOLUTIONS, LLC**,
a Florida limited liability company; **EMPIRICAL**
**DATA GROUP TECHNOLOGIES, LLC**, a Florida
limited liability company; **EPIPHANY MANAGEMENT**
**SYSTEMS, LLC**, a Florida limited liability company;
**STEVEN D. SHORT**, an individual; **KARISSA L.**
**DYAR**, an individual; **ONE EASY SOLUTION LLC**, a
Florida limited liability company; **CHRISTOPHER**
**C. MILES**, an individual; **JASON E. GAGNON**,
an individual; **KENNETH A. SALLIES**, an individual;
**MATTHEW B. THOMAS**, an individual;
**CARDREADY, LLC**, a California limited liability
company; **BRANDON A. BECKER**, an individual;
**JAMES F. BERLAND**, an individual; and **ANDREW**
**S. PADNICK**, an individual.

        Defendants.

_____

**FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION**
**AND OTHER EQUITABLE RELIEF**

Plaintiffs, FEDERAL TRADE COMMISSION ("FTC") and OFFICE OF THE

ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS (the

"Florida Attorney General"), allege:

1

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Trade Regulation Rule entitled "Telemarketing Sales Rule" ("TSR"), 16 C.F.R. Part 310.

2.      The Florida Attorney General brings this action for damages, injunctive relief, and other statutory relief under the Telemarketing Act, 15 U.S.C. § 6103(a) and under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Chapter 501, Part II, Florida Statutes (2015), to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for violations of the TSR, 16 C.F.R. Part 310, and FDUTPA in connection with the marketing and sale of debt relief services.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over the FTC's claims pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b(a), 6102(c), and 6105(b).

4.      This Court has subject matter jurisdiction over the Florida Attorney General's TSR claims pursuant to 15 U.S.C. § 6103(a).

5.      This Court has supplemental jurisdiction over the Florida Attorney General's FDUTPA claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims brought under federal law that they form part of the same case or controversy, and

because those claims arise out of the same transactions or occurrences as the claims brought pursuant to 15 U.S.C. § 6103(a).

6.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), 15 U.S.C. § 53(b), and 15 U.S.C. § 6103(e).

## SUMMARY OF THE CASE

7.      Through a web of entities and fictitious business names, Defendants E.M. Systems & Services, LLC; Administrative Management & Design, LLC; KLS Industries, LLC, d/b/a Satisfied Services Solutions, LLC; Empirical Data Group Technologies, LLC; Epiphany Management Systems, LLC; One Easy Solution, LLC; Steven D. Short; Karissa Dyar; and Christopher C. Miles (the "Debt Relief Defendants") operated a nationwide credit-card-interest-rate-reduction telemarketing scam (the "Debt Relief Scam"). The Debt Relief Scam worked by cold calling consumers with false promises that the Debt Relief Defendants would reduce consumers' interest rates on their credit cards, save consumers thousands of dollars in a short time period, and refund consumers' money if the promised savings were not realized. The Debt Relief Defendants charged an advance fee of about $1,000 on average to consumers who fell prey to these false promises. In return for the hefty fees that they paid, most consumers did not achieve any debt relief at all, but instead found themselves saddled with even more debt than before because of the fees the Debt Relief Defendants charged to their credit cards.

8.      The Debt Relief Scam was a reiteration of a scam that continues to surface. Indeed, two of the individual Defendants here, Steven Short and Karissa Dyar, participated in a near-identical scam that was recently shut down by this Court, *FTC v. Pro Credit Group*, Case No. 8:12-cv-00586-T-35EAJ (M.D. Fla.).

9.      Through a network of shell merchants and merchant bank accounts, Defendants

3

CardReady, LLC; Brandon A. Becker; James F. Berland; Andrew S. Padnick, along with Defendants Steven D. Short; Karissa Dyar; E.M. Systems & Services, LLC; Administrative Management & Design, LLC; KLS Industries, LLC; Empirical Data Group Technologies, LLC; Epiphany Management Systems, LLC, laundered consumer credit card payments for the Debt Relief Scam (the "Credit Card Laundering Scheme").

10.    Defendant CardReady LLC used some of the same shell merchants to launder credit card transactions in another telemarketing scheme shut down by a federal court in *FTC v. Apply Knowledge, LLC et al,* Case No 2:14-cv-00088-DB (Utah).

11.    Enticing consumers to pay significant sums of money through false promises of debt relief can be a lucrative business.  Indeed, since January 2013 Defendants have taken millions of dollars from consumers through the Debt Relief Scam and Credit Card Laundering Scheme.

12.    Consumers injured by the Defendants' schemes have submitted hundreds of complaints about the Debt Relief Scam to the Florida Attorney General, FTC, and Better Business Bureau ("BBB").

13.    In light of these facts, which are explained below in detail, the FTC and Florida Attorney General brought this action to halt the Debt Relief Scam and the Credit Card Laundering Scheme.

## **PLAINTIFFS**

14.    **Plaintiff Federal Trade Commission** is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

15.     The FTC also enforces the Telemarketing Act, 15 U.S.C. § 6102.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

16.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.   15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c), and 6105(b).  The FTC seeks equitable remedies in this action.

17.     **Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs**, is authorized to bring this action and to seek injunctive and other statutory relief to enforce the TSR pursuant to 15 U.S.C. § 6103(a).  The Florida Attorney General may seek to enjoin violations of the TSR, and to obtain such equitable relief as may be appropriate, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  *See* 15 U.S.C. § 6103(a).  The Florida Attorney General has reason to believe that the interests of the residents of Florida are being threatened or adversely affected by the Debt Relief Scam and the Credit Card Laundering Scheme designed to hide it, and brings this action on behalf of its residents.  The Florida Attorney General has complied with all conditions precedent to bringing this action.

18.     The Florida Attorney General is an enforcing authority of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Chapter 501, Part II, Florida Statutes (2014).  The Florida Attorney General has conducted an investigation of the matters alleged herein, and the head of the enforcing authority, Attorney General Pamela Jo Bondi, has determined that this

5

enforcement action serves the public interest.

19.     As an enforcing authority under FDUTPA, the Florida Attorney General is authorized to pursue this action to enjoin FDUTPA violations and to obtain equitable or other appropriate relief, including restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, and other equitable relief as may be appropriate pursuant to Sections 501.207, 501.2075, and 501.2077, Florida Statutes.  The Florida Attorney General seeks only equitable remedies in this action.

## DEFENDANTS

20.     As explained below, this case involves three sets of defendants: the E.M. Systems Defendants, the One Easy Defendants, and the CardReady Defendants.  The E.M. Systems Defendants are the five entities and two individuals at the center of the Debt Relief Scam.  The One Easy Defendants are the Debt Relief Scam's largest domestic telemarketer and its four individual owners.  Together, the E.M. Systems Defendants and the One Easy Defendants (the "Debt Relief Defendants") have operated the Debt Relief Scam.

21.     The CardReady Defendants are the credit card independent sales organization and three individual senior executives who have laundered the Debt Relief Scam's credit card payments through a web of shell merchants and dummy merchant credit card processing accounts.

## THE E.M. SYSTEMS DEFENDANTS

22.     **Defendant E.M. Systems & Services, LLC, ("E.M. Systems")** is a Florida limited liability company with its principal place of business at a United Parcel Service ("UPS") store located at 6822 22nd Avenue North, St. Petersburg, Florida 33710.  E.M. Systems transacts or has transacted business in this district and throughout the United States.

23.     **Defendant Administrative Management & Design, LLC, ("AM&D")** is a Florida limited liability company with its principal place of business at a UPS store located at 6822 22nd Avenue North, St. Petersburg, Florida 33710.  AM&D transacts or has transacted business in this district and throughout the United States.

24.     **Defendant KLS Industries, LLC, d/b/a Satisfied Services Solutions, LLC, ("KLS")** is a Florida limited liability company with its principal place of business in Pinellas County, Florida, at a PakMail store located at 873 West Bay Drive, Suite 142, Largo, Florida 33770.  KLS also has an office at 9365 U.S. Highway 19 North, Suite A, Pinellas Park, Florida 33782.  KLS transacts or has transacted business in this district and throughout the United States.

25.     **Defendant Empirical Data Group Technologies, LLC, ("EDG Tech")** is a Florida limited liability company with its principal place of business at 7441 114th Avenue, Suite 601, Largo, Florida 33773.  EDG Tech transacts or has transacted business in this district and throughout the United States.

26.     **Defendant Epiphany Management Systems, LLC, ("Epiphany")** is a Florida limited liability company with its principal place of business at Defendant Short's and Defendant Dyar's home address in Seminole, Florida.  Epiphany transacts or has transacted business in this district and throughout the United States.

27.     **Defendant Steven D. Short ("Short")** is the owner and sole member manager of Defendants E.M. Systems, AM&D, EDG Tech, and Epiphany.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had authority to control, or participated in the acts and practices of E.M. Systems, AM&D, EDG Tech, and Epiphany, including the acts and practices set forth in this Complaint.  Short resides in Pinellas County, Florida, and has transacted business in this district and throughout the United

States.

28.     **Defendant Karissa Dyar ("Dyar")** is the owner and sole member manager of Defendant KLS.  At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had authority to control, or participated in the acts and practices of KLS, including the acts and practices set forth in this Complaint.  Dyar resides in Pinellas County, Florida, and has transacted business in this district and throughout the United States.

### THE ONE EASY DEFENDANTS

29.     **Defendant One Easy Solution LLC ("One Easy")** is a Florida limited liability company with its principal place of business at 2750 Taylor Ave, Suite B6, Orlando, FL 32806.  One Easy transacts or has transacted business in this district and throughout the United States.

30.     **Defendant Christopher C. Miles ("Miles")** is a co-owner and manager of Defendant One Easy.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had authority to control, or participated in the acts and practices of One Easy, including the acts and practices set forth in this Complaint.  Miles resides in Orange County, Florida, and has transacted business in this district and throughout the United States.

31.     **Defendant Jason E. Gagnon ("Gagnon")** is a co-owner and manager of Defendant One Easy.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had authority to control, or participated in the acts and practices of One Easy, including the acts and practices set forth in this Complaint.  Gagnon resides in Orange County, Florida, and has transacted business in this district and throughout the United States.

32.     **Defendant Kenneth A. Sallies ("Sallies")** is a co-owner and manager of Defendant One Easy.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had authority to control, or participated in the acts and practices of One Easy, including the acts and practices set forth in this Complaint.  Sallies resides in Florida and has transacted business in this district and throughout the United States.

33.     **Defendant Matthew B. Thomas ("Thomas")** is a co-owner and manager of Defendant One Easy.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had authority to control, or participated in the acts and practices of One Easy, including the acts and practices set forth in this Complaint.  Thomas resides in Orange County, Florida, and has transacted business in this district and throughout the United States.

### THE CARDREADY DEFENDANTS

34.     **Defendant CardReady, LLC ("CardReady")** is a California limited liability company with its principal place of business at 1801 Century Park East, Suite 2400, Los Angeles, CA 90067.  CardReady transacts or has transacted business in this district and throughout the United States.  From at least November 2012 until October 2014, acting alone or in concert with others, CardReady provided credit card processing services to Short and E.M. Systems.

35.     **Defendant Brandon A. Becker ("Becker")** is an owner and the Chief Executive Officer of CardReady.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had authority to control, or participated in the acts and practices of CardReady, including the acts and practices set forth in this Complaint.  Becker has transacted business in this district and throughout the United States.

36.     **Defendant James F. Berland ("Berland")** is the Chief Operating Officer of CardReady.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had authority to control, or participated in the acts and practices of CardReady, including the acts and practices set forth in this Complaint.  Berland has transacted business in this district and throughout the United States.

37.     **Defendant Andrew S. Padnick ("Padnick")** is the Executive Vice-President of Business Development for CardReady.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had authority to control, or participated in the acts and practices of CardReady, including the acts and practices set forth in this Complaint.  Padnick has transacted business in this district and throughout the United States.

<strong><u>COMMON ENTERPRISE</u></strong>

38.     E.M. Systems, AM&D, EDG Tech, KLS, and Epiphany (the "Common Enterprise Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations alleged below.  The Common Enterprise has conducted the business practices described below through an interrelated network of companies that have common ownership, managers, business functions, office locations, phone numbers, websites, and advertising, and that commingled funds.

39.     Indeed, each of the Common Enterprise Defendants exists for the purpose of carrying out the Debt Relief Scam and funneling profits directly and indirectly to Short and Dyar, who are husband and wife.  Because they have operated as a common enterprise, each of the Common Enterprise Defendants is jointly and severally liable for the acts and practices alleged below.  Short and Dyar have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Common Enterprise Defendants.

## COMMERCE

40.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in the offering for sale and sale of goods or services via telephone, in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and as "trade or commerce" is defined in Section 501.203(8), Florida Statutes.

## THE DEBT RELIEF SCAM

41.     Since at least January 2013, the E.M. Systems Defendants and the One Easy Defendants (the "Debt Relief Defendants") engaged in a scheme to defraud consumers through their Debt Relief Scam, which they carried out under numerous fictitious business names with associated websites, including:

| Fictitious Business Name | Internet Domain Name |
|---|---|
| a.     Address My Savings | (addressmysavings.com); |
| b.     Applied Budgeting | (appliedbudgeting.com); |
| c.     Bigger Budget | (biggerbudget.com); |
| d.     Budgeting Insights | (budgetinginsights.com); |
| e.     Competitive Budgeting | (competitivebudgeting.com); |
| f.     Complete Budgeting | (completebudgeting.com); |
| g.     Conserved Budgeting | (conservedbudgeting.com); |
| h.     Consigned Savings | (consignedsavings.com); |
| i.     Containing Expenses | (containingexpenses.com); |
| j.     Datalink Financial | (datalinkfinancial.com); |
| k.     Decisive Budgeting | (decisivebudgeting.com); |
| l.     Efficient Budgeting | (efficientbudgeting.com); |
| m.     Insightful Budgeting | (insightfulbudgeting.com); |
| n.     Intuitive Budgeting | (intuitivebudgeting.com); |
| o.     Less Costly Living | (lesscostlyliving.com); |
| p.     Living Competitively | (livingcompetitively.com); |
| q.     Lowered Expenses | (loweredexpenses.com); |
| r.     Prepared Budgeting | (preparedbudgeting.com); |
| s.     Reduced Expenses | (reducedexpenses.com); |
| t.     Resourceful Budgeting | (resourcefulbudgeting.com); |
| u.     Sensible Budgeting | (sensiblebudgeting.com); |
| v.     Skilled Budgeting | (skilledbudgeting.com); |
| w.     Spend Less Monthly | (spendlessmonthly.com); |
| x.     The Next Financial | (thenextfinancial.com); |
| y.     Today's Financial Living | (todaysfinancialliving.com); |

z.     Total Budgeting             (totalbudgeting.com);
aa.    Your Household Budget       (yourhouseholdbudget.com);
bb.    Your New Budget             (yournewbudget.com); and
cc.    Your Next Financial Step    (yournextfinancialstep.com).

42.     Behind these fictitious names are Short and Dyar, who controlled and operated the Debt Relief Scam through the Common Enterprise, and who hired telemarketers, such as One Easy, to pitch their purported debt relief services to consumers.

43.     The Debt Relief Defendants engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of goods or services by use of one or more telephones and which involved more than one interstate telephone call.

**THE SALES PITCH**

44.     The Debt Relief Scam contacted consumers that had existing credit card debts through unsolicited telephone calls.

45.     In these unsolicited telephone calls, telemarketers, including One Easy, at the direction and under the control of the E.M. Systems Defendants, identified themselves as being with "card services," "credit services," "card member services," or one of the unregistered fictitious businesses listed in Paragraph 41.

46.     The telemarketers then often took steps to win consumers' trust and create an air of legitimacy to their sales pitch, including: (1) falsely stating that they are affiliated, or have business relationships, with consumers' lenders; (2) telling consumers that they already have their personal information, such as the names of some of their credit cards and/or the amount of their credit card debt; (3) providing the consumer with a license, ID, or badge number; and (4) directing consumers to the Internet domain name of the fictitious business name being used for the call.

47.     After taking these initial steps to win consumers' trust, the telemarketers made the

12

sales pitch. The telemarketers promised consumers that they would negotiate directly with the consumers' credit card companies to obtain an interest rate reduction and save them thousands of dollars on their credit card debts within a specific time period. The telemarketers typically promised a specific interest rate (*e.g.*, a reduction to 6% or lower), and a specific minimum amount of savings (*e.g.*, $5,000 amount of savings in ninety days).

### THE ADVANCE FEE AND MONEY-BACK GUARANTEE

48. The fee quoted by the telemarketers for the purported services was usually between $695 and $1,495.

49. The telemarketers convinced consumers to pay the fee by promising that if they did not obtain at least a specific amount of savings (usually between $2,500 and $5,000) within a specific number of days (usually sixty or ninety days), then the consumers' fees would be refunded.

50. Consumers who decided to purchase the Debt Relief Defendants' purported services were asked for their credit card numbers and billing information. The E.M. Systems Defendants charged consumers' credit cards during the telemarketing call before any of the purported debt relief services were provided. Consumers were told that they would receive a contract or service agreement and documents for their signature and that they should promptly return those documents.

### CONSUMERS DID NOT RECEIVE WHAT THEY WERE PROMISED

51. In some instances, after consumers paid the hefty up-front fee, the consumers never heard from the Debt Relief Defendants again and the consumers' attempts at further communication were ignored.

52. In other instances, after consumers paid the hefty up-front fee, the E.M. Systems

Defendants sent the consumers a package of documents with information about the purported services and forms for the consumers to fill out and return.  Often among these documents was a "Frequently Asked Questions" guide that reiterated the promise to "simply and aggressively negotiate with your creditor(s) to provide you with substantial saving."

53.     For consumers who completed and returned the forms, the E.M. Systems Defendants then sometimes sent a "Customized Budget Plan," which simply provided consumers with obvious advice such as that paying more than the minimum payments each month would result in the credit card debt being paid off faster.

54.     The Debt Relief Defendants rarely, if ever, provided the interest rate reductions and savings that they promised to consumers.

55.     When consumers followed up on the status of interest rate negotiations, the Debt Relief Defendants sometimes stalled consumers by saying that the negotiations were ongoing.  In fact, most credit card issuers do not negotiate interest rates, and most typically will not discuss consumers' accounts with third parties such as the Debt Relief Defendants.

56.     Although the Debt Relief Defendants promised consumers that they would obtain a full refund if they did not save thousands of dollars within a certain number of days, the Debt Relief Defendants frequently did not honor this money-back guarantee.  Not only did the Debt Relief Defendants frequently refuse to give refunds, they also sometimes threatened consumers or subjected them to abusive language when they attempted to obtain refunds.

57.     In sum, the Debt Relief Defendants did not keep their promises to consumers: they typically did not obtain lower interest rates for consumers; did not save consumers thousands of dollars in a specific time period; and did not return consumers' money.  Instead, consumers who fell prey to the Debt Relief Scam often ended up more indebted than before

14

because of the Debt Relief Defendants' hefty fees.

**THE CREDIT CARD LAUNDERING SCHEME**

A.   **Overview of Merchant Accounts and Credit Card Laundering**

58.   A merchant account is a type of account that allows businesses to process consumer purchases by a credit or debit card.  Merchant accounts are available through financial institutions called merchant acquiring banks or "acquirers."

59.   Without access to a merchant acquiring bank that is a member of the credit card associations, such as MasterCard or VISA, merchants are not able to accept consumer credit or debit card payments.

60.   Merchant acquiring banks frequently enter into contracts with payment processors that manage the bank's merchant processing program.  Merchant acquiring banks and payment processors often enter into contracts with Independent Sales Organizations (ISOs) to sign up merchants for merchant accounts.  A sales agent is a person that refers prospective clients to payment processors or ISOs for payment processing.

61.   Before a payment processor will establish a merchant account, the merchant has to meet the bank and processor's underwriting criteria.  Under the processor's contract with an ISO, the ISO often agrees to solicit merchants who meet the bank and processor's underwriting criteria.

62.   Some companies are denied merchant accounts because the ISO or the payment processor concludes that the company applying for the merchant account is too much of a risk. For example, the payment processor may conclude that the merchant might be at risk of operating in an illegal way or might be concerned that the merchant will generate excessive rates of transactions returned by consumers ("chargebacks").

63.   If a merchant is not able to obtain a credit card merchant account or does not wish

to use its own name to establish a merchant account, the merchant, or the ISO or sales agent seeking to sign up the merchant for processing, may recruit another company (that does have a merchant account or that can readily open a merchant account) to act as a "front" so the merchant can process credit card transactions through the recruited company's merchant account. This is known as credit card laundering and is an unlawful business practice.

64.     Credit card laundering negatively affects commerce in the marketplace.  In the event of fraud, consumers who have suffered a financial loss will file complaints against the recruited company that charged their accounts, rather than the merchant that initiated the charges, because the latter cannot be not identified through the charge that appears on the credit card statement of the consumer.  The confusion about what company caused consumer injury can make it easy for unscrupulous merchants to avoid detection by consumers and by law enforcement.  Furthermore, even if the bank and processors terminate the account that was used to launder credit card payments, the bank and processor may not learn the identity of the true culprit that caused excessive chargebacks.  The true culprit is then able to perpetuate the scheme as long as it can recruit other companies to provide access to their merchant accounts.

**B.      The CardReady Defendants and the E.M. Systems Defendants Engaged in a Scheme to Illegally Launder Credit Card Payments for the Debt Relief Scam**

65.     CardReady operates as an independent sales organization (ISO) that solicits merchants in need of credit card processing services to obtain merchant accounts with a financial institution.

66.     During the time the Debt Relief Scam operated, CardReady maintained an agreement with a credit card processor named First Pay Solutions ("First Pay").  Under this agreement, CardReady agreed to act as an ISO for First Pay and solicit merchants that were bona fide businesses and which met certain underwriting requirements.

67.     In 2012, Short approached a CardReady sales agent to obtain a merchant account for E.M. Systems to process credit card transactions for the Debt Relief Scam.

68.     Short was not able to obtain a merchant account for E.M. Systems through CardReady because he was not able to meet First Pay's underwriting requirements.

69.     From at least November 2012 to October 2014, to enable Short and E.M. Systems to access First Pay's processing services, CardReady's officers, employees, and agents solicited at least 26 "straw men" (the "Solicited Merchants"), most of whom lived in the Los Angeles area, to act as signatories on shell businesses and dummy merchant accounts used to process credit card payments for E.M. Systems.  Many of the Solicited Merchants were friends and personal contacts of CardReady employees.  Becker personally recruited at least one of the Solicited Merchants.

70.     The Solicited Merchants were told they could earn monthly income if they provided to CardReady copies of their driver's license and bank statements, and if they signed partially blank merchant processing and incorporation documents.  The Solicited Merchants signed and provided the requested documents and information to CardReady.

71.     Using the Solicited Merchants' personal and financial information and signed forms, CardReady employees submitted paperwork to create at least 26 shell limited liability companies whose DBAs were the same as those used by the Debt Relief Scam.

72.     Using the Solicited Merchants' personal and financial information and signed forms, CardReady submitted falsified merchant processing account applications to First Pay that depicted the shell companies as bona fide businesses.  In numerous instances, falsified information was added to the merchant applications after the Solicited Merchants had signed the application.  In other instances, CardReady employees or agents forged the Solicited Merchant's

signature, initials, or date of signature, on merchant account applications submitted to First Pay.

73.     Based on the falsified merchant account applications submitted by CardReady, First Pay approved at least 26 credit card merchant accounts, one for each of the Solicited Merchants.

74.     The E.M. Systems Defendants used the 26 merchant accounts to process its telemarketing transactions with consumers.  From at least January 2013 to October 2014, the 26 merchant accounts processed sales drafts that were the result of telemarketing transactions between consumers and the Debt Relief Scam, and not between consumers and the Solicited Merchants.

75.     Without the Solicited Merchants' knowledge or authorization, CardReady also created merchant bank accounts known as "sub-accounts" for each of the shell LLCs.  Becker and Berland are the signatories and contacts on the CardReady "control account" that created numerous shell LLC sub-accounts.  Other merchant bank accounts were created for the shell LLCs using forged signature cards and other falsified documents.

76.     From at least January 2013 to October 2014, the shell LLC bank accounts, or sub-accounts, created by CardReady received sales revenue generated by transactions between consumers and the Debt Relief Defendants.  Berland and Short divided the revenues among CardReady, One Easy, and E.M. Systems, with a small fee to each Solicited Merchant.

77.     Other than receiving a small fee from CardReady, the Solicited Merchants had no actual business relationship with Short, E.M. Systems, or any of the other Debt Relief Defendants.  During the time the Debt Relief Scam operated, the Solicited Merchants did not know where their shell companies had been incorporated or the type of charges their shell merchant accounts were processing.

78.     At various times, Becker, Berland, and Padnick communicated about using the Solicited Merchants and the shell LLCs to process transactions between consumers and E.M. Systems.

79.     Berland and Short regularly exchanged emails and spreadsheets showing that transactions between consumers and E.M. Systems were processed through the shell LLC merchant credit card accounts.  In certain instances, Berland forwarded the spreadsheets to Becker with comments about chargebacks generated by the shell LLC accounts.

80.     In exchange for recruiting the Solicited Merchants, creating the shell LLCs, and obtaining merchant accounts to process the Debt Relief Scam revenues, CardReady retained a substantial portion of the revenue generated by the Debt Relief Scam.

**C.     CardReady Provided Substantial Assistance to E.M. Systems and Short by Processing Their Credit Card Transactions, Despite Evidence of Deceptive Telemarketing Representations and High Chargebacks**

81.     CardReady substantially assisted Defendants E.M. Systems and Short by providing payment processing services that permitted them to access the credit card networks and charge millions of dollars of fees to the credit cards of consumers who purchased services through the Debt Relief Scam.

82.     The CardReady Defendants substantially assisted Defendants E.M. Systems and Short by creating bank accounts for the Shell LLCs that received revenue for E.M. Systems' transactions.

83.     The CardReady Defendants substantially assisted Defendants E.M. Systems and Short by recruiting the Solicited Merchants to process transactions for E.M. Systems.   This permitted E.M. Systems to avoid scrutiny by credit card payment networks such as Visa and Mastercard.   Mastercard, for example, classifies a merchant as a "Chargeback Monitored

Merchant" ("CMM") if it has over 100 chargebacks per month. This designation subjects the merchant to increased reporting requirements about its chargeback data, and escalates the merchant toward termination by the credit card network. By soliciting shell merchants and establishing dummy credit card merchant accounts for the Debt Relief Scam's use, the CardReady Defendants allowed the scam to spread its chargebacks across 26 different merchant accounts.

84.    At various times, CardReady received spreadsheets with consumer complaints against the shell LLCs regarding telemarketer misrepresentations about debt relief services. Berland received complaints against the shell LLCs from consumers who stated they were told by telemarketers that their credit card interest rate would be lowered for an upfront fee of $695-1,295.

85.    At various times, Berland and other CardReady employees communicated about telemarketing verification scripts used by E.M. Systems' telemarketers. In May 2014, Berland emailed Short instructing him to include in E.M. Systems' verification recordings language stating that customers had not been offered an interest rate reduction service, "[g]iven all of the problems that the accounts are having and the continue[d] reporting of chargebacks and complaints about interest rate reduction."

86.    Despite the division of sales among the dummy merchant accounts, from April to December 2014, 11 of the 26 shell LLCs were placed on the MasterCard Alert to Control High-risk ("MATCH") list for excessive chargebacks.

87.    First Pay terminated several of the shell LLC merchant accounts and, at various, times, sent correspondence to CardReady, Berland, and Padnick, informing them that the accounts had been terminated due to excessive chargebacks.

88.     Becker, Berland, Padnick, and Short routinely communicated about excessive chargebacks on the shell LLC merchant accounts and the resultant account terminations.  For example, in April 2014, Berland emailed to Short in reference to chargeback activity on the shell LLC merchant accounts: "If this program was stopped we would bleed out nearly a million dollars in the first three months.  We are going to have to take more reserves to accumulate more protection."  In addition, in May 2014, Becker emailed to Berland, "I'm seeing the Steve Short refunds and CB's [chargebacks] at high numbers."

89.     Despite increased consumer complaints and chargeback activity, CardReady continued to process credit card transactions for the Debt Relief Scam through the shell LLCs. Months after CardReady learned about the increased chargebacks, CardReady solicited at least one new merchant to begin processing charges for E.M. Systems.  In March 2015, Berland and Short emailed about finding new merchants to process charges for E.M. Systems.

## VIOLATIONS OF THE FTC ACT

90.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

91.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

## DECEPTIVE MARKETING IN VIOLATION OF THE FTC ACT

### (By Plaintiff FTC against the Debt Relief Defendants)

92.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of debt relief services, Defendants E.M. Systems & Services, LLC; Administrative Management & Design, LLC; KLS Industries, LLC, d/b/a Satisfied Services Solutions, LLC; Empirical Data Group Technologies, LLC; Epiphany Management Systems,

LLC; Steven D. Short; Karissa Dyar; One Easy Solution, LLC; Christopher C. Miles, and Jason E. Gagnon; Kenneth A. Sallies; Matthew B. Thomas (the "Debt Relief Defendants") represent, directly or indirectly, expressly or by implication, that:

      a.     The Debt Relief Defendants are affiliated, or have established business relationships, with consumers' lenders;

      b.     Consumers who purchase the Debt Relief Defendants' debt relief services will have their credit card interest rates reduced;

      c.     Consumers who purchase the Debt Relief Defendants' debt relief services will save thousands of dollars in a short time period; and

      d.     The Debt Relief Defendants will provide full refunds if consumers do not save thousands of dollars in a short time period.

93.     In truth and in fact, in numerous instances in which the Debt Relief Defendants make the representations set forth in Paragraph 92 of this Complaint:

      a.     The Debt Relief Defendants are not affiliated, and do not have established business relationships, with consumers' lenders;

      b.     Consumers who purchase the Debt Relief Defendants' debt relief services do not have their credit card interest rates reduced;

      c.     Consumers who purchase the Debt Relief Defendants' debt relief services do not save thousands of dollars in a short time period; and

      d.     The Debt Relief Defendants do not provide full refunds when consumers fail to save thousands of dollars in a short time period.

94.     Therefore, the Debt Relief Defendants' representations as set forth in Paragraph 92 of this Complaint are false or unsubstantiated and constitute deceptive acts or practices in

22

violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TSR

95.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original Telemarketing Sales Rule in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

96.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c) and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

97.     The Debt Relief Defendants are "sellers" and/or "telemarketers" engaged in "telemarketing," and have initiated, or have caused telemarketers to initiate, "outbound telephone calls" to consumers to induce the purchase of goods or services, as those terms are defined in the TSR, 16 C.F.R. § 310.2(v), (aa), (cc), and (dd).  The Debt Relief Defendants also are sellers or telemarketers of "debt relief services," as defined by the TSR, 16 C.F.R. § 310.2(m).

98.     The Debt Relief Defendants market and sell a "debt relief service," as that term is defined in the TSR.  16 C.F.R. § 310.2(m) ("debt relief service" defined as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payments or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector").

99.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of any debt relief service.   16 C.F.R. § 310.3(a)(2)(x).

100.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies.   16 C.F.R. § 310.3(a)(2)(iv).

101.     The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

    a.    The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

    b.    The consumer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

    c.    To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either (1) bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount; or (2) is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. 16 C.F.R. § 310.4(a)(5)(i).

102.    Under the TSR, a "merchant" means a person who is authorized under a written contract with an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.   16 C.F.R. § 310.2(s).

103.    It is a violation of the TSR for: (1) a merchant to present to or deposit into, or cause another to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; (2) any person to employ, solicit, or otherwise cause a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or (3) any person to obtain access to the credit card system through the use of a business relationship or an affiliation with a merchant, when such access is not authorized by the merchant agreement or the applicable credit card system.   16 C.F.R. § 310.3(c).

104.    The TSR also prohibits a person from providing substantial assistance or support to any seller or telemarketer when that person "knows or consciously avoids knowing" that the seller or telemarketer is engaged in any act or practice that violates Section 310.3(c).  16 C.F.R. § 310.3(b).

## COUNT II

### DECEPTIVE REPRESENTATIONS ABOUT DEBT RELIEF SERVICES
### IN VIOLATION OF THE TSR

### (By Plaintiffs FTC and Florida Attorney General
### against the Debt Relief Defendants)

105.    In numerous instances in connection with the telemarketing of debt relief services,

the Defendants E.M. Systems & Services, LLC; Administrative Management & Design, LLC; KLS Industries, LLC, d/b/a Satisfied Services Solutions, LLC; Empirical Data Group Technologies, LLC; Epiphany Management Systems, LLC; Steven D. Short; Karissa Dyar; One Easy Solution, LLC; Christopher C. Miles, and Jason E. Gagnon; Kenneth A. Sallies; Matthew B. Thomas (the "Debt Relief Defendants") misrepresent, directly or indirectly, expressly or by implication, that:

    a.    The Debt Relief Defendants are affiliated, or have established business relationships, with consumers' lenders;

    b.    Consumers who purchase the Debt Relief Defendants' debt relief services will have their credit card interest rates reduced; and

    c.    Consumers who purchase the Debt Relief Defendants' debt relief services will save thousands of dollars in a short time period.

106.    The Debt Relief Defendants' acts and practices, as set forth in Paragraph 105 of this Complaint, are deceptive telemarketing practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(x).

## COUNT III

### DECEPTIVE REPRESENTATIONS ABOUT REFUNDS IN VIOLATION OF THE TSR

**(By Plaintiffs FTC and Florida Attorney General against the Debt Relief Defendants)**

107.    In numerous instances in connection with the telemarketing of debt relief services, the Defendants E.M. Systems & Services, LLC; Administrative Management & Design, LLC; KLS Industries, LLC, d/b/a Satisfied Services Solutions, LLC; Empirical Data Group Technologies, LLC; Epiphany Management Systems, LLC; Steven D. Short; Karissa Dyar; One Easy Solution, LLC; Christopher C. Miles, and Jason E. Gagnon; Kenneth A. Sallies; Matthew

B. Thomas (the "Debt Relief Defendants") misrepresent, directly or indirectly, expressly or by implication, that they will provide full refunds if consumers do not save thousands of dollars in a short time period.

108.    The Debt Relief Defendants' acts and practices, as set forth in Paragraph 107 of this Complaint, are deceptive telemarketing practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(iv).

## COUNT IV

### ADVANCE FEES FOR DEBT RELIEF SERVICES IN VIOLATION OF THE TSR

#### (By Plaintiffs FTC and Florida Attorney General against the Debt Relief Defendants)

109.    In numerous instances in connection with the telemarketing of debt relief services, Defendants E.M. Systems & Services, LLC; Administrative Management & Design, LLC; KLS Industries, LLC, d/b/a Satisfied Services Solutions, LLC; Empirical Data Group Technologies, LLC; Epiphany Management Systems, LLC; Steven D. Short; Karissa Dyar; One Easy Solution, LLC; Christopher C. Miles, and Jason E. Gagnon; Kenneth A. Sallies; Matthew B. Thomas (the "Debt Relief Defendants") request or receive payment of a fee or consideration for such services before (a) they have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (b) the customer has made at least one payment pursuant to that agreement.

110.    The Debt Relief Defendants' acts and practices, as set forth in Paragraph 109 of this Complaint, are abusive telemarketing practices that violate the TSR, 16 C.F.R. § 310.4(a)(5)(i).

## COUNT V

### CREDIT CARD LAUNDERING IN VIOLATION OF THE TSR

**(By Plaintiffs FTC and Florida Attorney General against
the CardReady Defendants and the E.M. Systems Defendants)**

111.     In numerous instances and without the express permission of the applicable credit card system, CardReady, LLC, Brandon A. Becker, James F. Berland, and Andrew S. Padnick (the "CardReady Defendants") and E.M. Systems & Services, LLC; Administrative Management & Design, LLC; KLS Industries, LLC; Empirical Data Group Technologies, LLC; Epiphany Management Systems, LLC; Steven D. Short, and Karissa Dyar (the "E.M. Systems Defendants") have employed, solicited, or otherwise caused the Solicited Merchants, or representatives or agents of the Solicited Merchants, to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the Solicited Merchants, as described in Paragraphs to 65-80 above, that violate Section 310.3(c)(2) of the TSR.

112.     The CardReady Defendants and the E.M. Systems Defendants' acts or practices, as described in Paragraph 111 above, are deceptive telemarketing acts or practices, that violate the TSR, 16 C.F.R. § 310.3(c)(2).

## COUNT VI

### ASSISTING AND FACILITATING DECEPTIVE AND ABUSIVE TELEMARKETING ACTS IN VIOLATION OF THE TSR

**(By Plaintiffs FTC and Florida Attorney General against the
CardReady Defendants)**

113.     In numerous instances, CardReady, LLC, Brandon A. Becker, James F. Berland, and Andrew S. Padnick (the "CardReady Defendants") provided substantial assistance or support

28

to Defendants E.M. Systems & Services, LLC and Steven D. Short, whom the CardReady Defendants knew, or consciously avoided knowing, were engaged in violations of the TSR set forth in Counts Two and Five of this First Amended Complaint.

114.     The CardReady Defendants acts or practices, as described in Paragraph 113 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(b).

## VIOLATIONS OF FDUTPA

115.     Section 501.204(1), Florida Statutes, prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

116.     Section 501.203(8), Florida Statutes, defines "trade or commerce" as:

> the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated.   "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

117.     At all times material hereto, Defendants have engaged in "trade or commerce" as defined by Section 501.203(8), Florida Statutes.

## COUNT VII

### DECEPTIVE REPRESENTATIONS IN VIOLATION OF FDUTPA

**(By Plaintiff Florida Attorney General against the
Debt Relief Defendants)**

118.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of debt relief services, Defendants E.M. Systems & Services, LLC; Administrative Management & Design, LLC; KLS Industries, LLC, d/b/a Satisfied Services Solutions, LLC; Empirical Data Group Technologies, LLC; Epiphany Management Systems, LLC; Steven D. Short; Karissa Dyar; One Easy Solution, LLC; Christopher C. Miles, and Jason

E. Gagnon; Kenneth A. Sallies; Matthew B. Thomas (the "Debt Relief Defendants") represent, directly or indirectly, expressly or by implication, that:

a.   The Debt Relief Defendants are affiliated, or have established business relationships, with consumers' lenders;

b.   Consumers who purchase the Debt Relief Defendants' debt relief services will have their credit card interest rates reduced;

c.   Consumers who purchase the Debt Relief Defendants' debt relief services will save thousands of dollars in a short time period; and

d.   The Debt Relief Defendants will provide full refunds if consumers do not save thousands of dollars in a short time period.

119.   In truth and in fact, in numerous instances in which the Debt Relief Defendants make the representations set forth in Paragraph 118 of this Complaint:

a.   The Debt Relief Defendants are not affiliated, and do not have established business relationships, with consumers' lenders;

b.   Consumers who purchase the Debt Relief Defendants' debt relief services do not have their credit card interest rates reduced;

c.   Consumers who purchase the Debt Relief Defendants' debt relief services do not save thousands of dollars in a short time period; and

d.   The Debt Relief Defendants do not provide full refunds when consumers fail to save thousands of dollars in a short time period.

120.   Therefore, the Debt Relief Defendants' representations as set forth in Paragraph 118 are false and misleading, constitute deceptive acts or practices in violation of Section 501.204(1), Florida Statutes, and were likely to mislead a consumer acting reasonably.   As a

result, consumers within the state of Florida and elsewhere were actually misled by the representations set forth in Paragraph 118.

## COUNT VIII

### ILLEGAL FACTORING OF CREDIT CARD TRANSACTIONS IN VIOLATION OF FLORIDA STATUTES, SECTIONS 817.62(3)(b) & (c) AND FDUTPA

**(By Plaintiff Florida Attorney General against the CardReady Defendants and the E.M. Systems Defendants )**

121.    In numerous instances and without the express permission of the applicable credit card system, CardReady, LLC, Brandon A. Becker, James F. Berland, and Andrew S. Padnick (the "CardReady Defendants") and E.M. Systems & Services, LLC; Administrative Management & Design, LLC; KLS Industries, LLC; Empirical Data Group Technologies, LLC; Epiphany Management Systems, LLC; Steven D. Short, and Karissa Dyar (the "E.M. Systems Defendants"), without the authorization of a merchant account acquirer, utilized the Solicited Merchants to remit to the acquirer a credit card transaction record of a sale that was not made by the Solicited Merchants or their agents or employees.

122.    Florida Statute, Sections 817.62(3)(b) & (c) provide:

(b)    A person who, without the acquirer's authorization, employs, solicits, or otherwise causes a person who is authorized by an acquirer to furnish money, goods, services, or anything else of value upon presentation of a credit card or a credit card account number by a cardholder, or employs, solicits, or otherwise causes an agent or employee of such authorized person, to remit to the acquirer a credit card transaction record of a sale that was not made by such authorized person or his or her agent or employee violates this paragraph and is subject to the penalties set forth in s. 817.67(2).

(c)    Any violation of this subsection constitutes an unfair or deceptive act or practice within the meaning of s.501.204 and thus the basis for a civil or administrative action by an enforcing authority pursuant to part II of chapter 501.

123.    The CardReady Defendants and the E.M. Systems Defendants, in the course of

procuring sales for the E.M. Systems Defendants' services, violated Sections 817.62(3)(b) & (c), Florida Statutes, and, consequently, Section 501.204, Florida Statutes.

## CONSUMER INJURY

124.     Consumers throughout the United States, including those in the state of Florida, have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, TSR, and FDUTPA.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

125.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

126.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

127.     The FDUTPA counts may be enforced by this Court through its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  This Court may award equitable relief under Chapter 501, Part II, Florida Statutes, including injunctive relief, restitution, costs and attorneys' fees, and such other equitable relief to which the Florida Attorney General may be entitled.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. §6105(b), FDUTPA, Chapter 501, Part II, Florida Statutes (2014), and the Court's own equitable powers, request that the Court:

A.    Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access, and appointment of a receiver;

B.    Enter a permanent injunction to prevent future violations of the FTC Act, TSR, and FDUTPA by Defendants;

C.    Award such equitable relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, TSR, and FDUTPA, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.    Award Plaintiffs the costs of bringing this action, as well as such other and additional equitable relief as the Court may determine to be just and proper.

Dated:  December 17, 2015                    Respectfully submitted,


FEDERAL TRADE COMMISSION          OFFICE OF THE ATTORNEY GENERAL
                                 STATE OF FLORIDA,
Jonathan E. Nuechterlein         DEPARTMENT OF LEGAL AFFAIRS
General Counsel


                                 Pamela Jo Bondi
                                 Attorney General

Nicholas M. May, DC Bar # 979754
nmay@ftc.gov
Anna M. Burns, GA Bar # 558234    Amanda Arnold Sansone, FL Bar # 587311
aburns@ftc.gov                   amanda.sansone@myfloridalegal.com
225 Peachtree Street NE, Ste 1500 Jennifer Hayes Pinder, FL Bar #017325
Atlanta, GA 30303                jennifer.pinder@myfloridalegal.com
Phone: 404-656-1360 (May)        3507 East Frontage Road #325
404-656-1350 (Burns)             Tampa, Florida 33607
Fax: 404-656-1390                Phone: 813-287-7950
                                 Fax: 813-281-5515